## PRESSED STEEL CAR CO. v. WEISSER.

(Circuit Court of Appeals, Third Circuit. July 12, 1910.)

### No. 1,339.

1. JUDGMENT (§ 199*)—TRIAL (§ 139*)—TAKING CASE FROM JURY—SUFFICIENCY OF EVIDENCE.

If the evidence in a case is such that a verdict for the plaintiff reasonably could be found by the jury in the honest discharge of their duty, the court cannot properly give a binding instruction for defendant, nor render judgment for him non obstante veredicto.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 367; Dec. Dig. § 199;* Trial, Cent. Dig. § 338; Dec. Dig. § 139.*]

2. MASTER AND SERVANT (§ 286*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Evidence considered in an action by an employé in a steel car manufacturing plant to recover for an injury, and *held* sufficient to warrant the submission to the jury of the questions of defendant's negligence in permitting an electric crane to become and remain out of repair, and whether the injury was due to such defective condition of the crane.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

Action by Charles Weisser against the Pressed Steel Car Company. Judgment for plaintiff, and defendant brings error. Affirmed.

W. S. Dalzell, for plaintiff in error.

Rody P. Marshall, for defendant in error.

Before LANNING, Circuit Judge, and BRADFORD and ARCHBALD, District Judges.

BRADFORD, District Judge. The Pressed Steel Car Company, a corporation of New Jersey, has taken this writ of error to reverse a

judgment recovered against it for $1,000 in the Circuit Court of the United States for the Western District of Pennsylvania in an action of trespass brought by Charles Weisser, a citizen and resident of Pennsylvania.

There are three assignments, of which the third has been abandoned. The other two are to the effect that the court below erred, first, in denying a motion for a judgment non obstante veredicto; and, second, in refusing to give an instruction to the jury that under all the evidence in the case the verdict must be for the defendant. These two assignments present the question whether there was evidence in the case from which the jury in the due exercise of its proper function could find a verdict for the plaintiff. The general rule that in civil causes before a jury a verdict should be rendered in accordance with the preponderance of the evidence cannot by reason of the infirmities of human judgment always be enforced. Reasonable and honest men often widely differ in the conclusion to be drawn from a given state of evidence. If the evidence was such that a verdict for the plaintiff reasonably could be found by the jury in the honest discharge of their duty, the court below properly refused to give a binding instruction for the defendant, and properly denied the motion for judgment non obstante veredicto.

The action was brought to recover damages for personal injuries sustained by the plaintiff while in the employ of the company at its steel car works in Allegheny county, Pa., February 1, 1907. The plaintiff had been so employed for a period of about six months prior to the occurrence of the accident. On entering the service of the company, his employment was checking materials brought into the works for manufacture. He served in that capacity for a month, and then became assistant foreman of the shearing department of the forge plant. In carrying on the operations of the company an electric overhead traveling crane from 20 to 30 feet above the floor was used to unload from cars steel in pieces or slabs from 12 to 18 feet long, 3 to 4 inches wide, and 1 inch thick. The crane load consisted of about 20 such pieces, and was raised by means of chains looped around each end of the load and attached to a hook suspended from the crane. Having been raised to a proper height, the crane carried the load until it was over the desired place of deposit, and then lowered it to the ground or floor. Where it was intended to place one crane load of steel upon another, it was customary to lay two pieces of scantling on the top of the load first lowered in order that the second load when placed on it might be supported without causing any spreading, and also to permit the ready removal of the chains from under the second load. On the day of the accident, and shortly before its occurrence, the plaintiff was directed by the general foreman of the forge plant, owing to the absence of the regular checker, to unload, place, and check a car load of such steel pieces which had just arrived. Before the accident one crane load had been taken from the car, carried to the proper point and lowered to the floor, and the plaintiff had placed scantling on the top of the load. By reason of the proximity of some buggies or tram cars containing steel only a very narrow space was

left to be occupied by the plaintiff in the discharge of his duty, and, when the second crane load came in contact with the first, the steel pieces "kicked out," striking the plaintiff, and causing the injuries for which the jury awarded damages. The operation of the crane at the time of the accident was in charge of one Morrison. In his statement of claim the plaintiff alleges, among other things, that his injuries were sustained through the negligence of the company in failing to have a crane and its appliances in a proper and safe condition, and in failing to make proper inspection of the same. The plaintiff testified:

"I had to get between these two buggies of iron that I had cut during the day—between these buggies of iron and this pile that was hanging in the chains and also the pile on the ground. When pulled in, the crane commenced to slip, and, before I' could get out, the weight had gone to the bottom of the pile of iron, and it spread and fell on both my legs. * * *

"Q. Had you ever worked at that crane before? A. When I 'first started to work there. Only worked a week.

"Q. How long before? A. Over five months.

"Q. When you worked on that crane five months before, was it in good condition? A. Yes, sir. * * *

"Q. Would it slip when it was in good condition? A. No, sir.

"Q. Do you know what would cause it to slip? A. I would imagine that the brake was out of order. * * *

"Q. Did you know that this crane would slip before it hurt you? A. No, sir."

The witness Clark, who was the regular checker and had been working at the crane for some weeks next before the accident, testified:

"Q. Did you work at that crane before the day that he was hurt? A. Yes, sir.

Q. For how long? A. Well, I don't just recall how long. It was for a couple of months before that, may be more. * * *

"Q. For the couple of months that you were at the crane, what did you have to do with the crane? A. When the cars would come in, 1 had to check the material and take the crane, and lift it where I thought it ought to be placed.

"Q. What did you do with reference to placing it? 'A. Directed the hook-ons whereabouts to put it. * * *

"Q. What was the condition of that crane on the day that Mr. Weisser was hurt? A. Well, before and after Charlie got hurt the crane was in no condition to work. The crane would 'slip when we would have a heavy load.

"Q. For how long before Charlie was hurt would the crane slip? A. That I couldn't say positive. * * *

"Q. Could you tell from the way the crane slipped what was the matter with it? A. Yes, sir.

"Q. What was the matter with it? A. Well, the brake band was loose, and, when we would' have a heavy load, they would have to use the power to hold it, and, if you were to shove the lever back into center, the load would go down.

"Q. If the crane was in good working order and you would shove the lever to the center would the load go down? A. It oughtn't to. I don't think it should.

"Q. When this crane was in good order, would it? A. No, sir."

The witness W. G. Weisser, a brother of the plaintiff, who had been employed at the works of the company for a year and a half before the accident, testified:

"Q. Did you know this crane that he was injured at? A. Yes, sir. * * *

"Q. Do you know the condition that crane was in before your brother was injured? A. Yes, sir.

"Q. For how long before? A. Two—possibly three weeks.

"Q. What condition was it in? A. I considered it in very poor condition.

"Q. Explain wherein it was in poor condition? A. When they had a load on—a rather heavy load—it would slip.

"Q. If it was in good condition would it slip with a load on? A. No, sir; it shouldn't. I wouldn't think so. * * *

"Q. How long before this accident do you suppose it was that you had even passed around in this forge department? A. Several times two or three weeks before.

"Q. The last time was probably two or three weeks before this accident? A. The last time was about a week before.

"Q. Was the crane in the condition that you describe—slipping, the week before? A. It was."

Morrison, a witness for the company, who operated the crane at the time of the accident and had been working in the forge department a considerable time prior to its occurrence, testified:

"Q. What was the condition that crane was in at the time of this accident? A. It was in perfect condition. * * *

"Q. Did you have any difficulty for a week before this accident, or at any time before this accident, with regard to not being able to hold a load on this crane? A. No, sir. * * *

"Q. Hadn't it been slipping when you had a heavy load on for three weeks before that? A. It never did. * * *

"Q. At the time Mr. Weisser was injured, will you just state what you were doing? A. We were unloading a car of steel, and we had taken one lift out of the car and placed it in the mill, and was taking another lift out and was placing it down on top of the other pile. The steel was all over snow and ice, and, when I lowered, I seen the chain was going to foul, and I held the load until he got some sticks to put under it. He motioned to lower, and I didn't lower because I saw he was in a dangerous position. He motioned a second time and still I didn't lower. He motioned a third time and I lowered, and the bottom pile kicked out and caught his leg.

"Q. You had control of the crane all that time? A. Yes, sir.

"Q. How long do you suppose you held that load there? A. I held it afterwards until they came back from the office and the hook-ons came back, and we lowered it on the same pile.

"Q. The same load? A. Yes, sir.

"Q. Was it the load that injured Mr. Weisser's leg, or was it the kicking out of the material you had already dumped? A. The kicking out of the material already dumped."

There was thus a direct conflict between Morrison and the plaintiff and his witnesses touching the condition of the crane at and before the time of the accident. We do not think that the fact that just after the accident the second crane load was raised and held suspended for some time necessarily excludes the idea that a slipping occurred immediately before the accident. Morrison is the only witness who testified that there was no slipping at the time of the accident. The evidence on the part of the company as to the condition of the crane for some time previous to the accident is by no means conclusive or even satisfactory. Aside from Morrison and the physician who attended the plaintiff, there were only three witnesses examined, Neylon, Antes, and Corcoran. Neylon was the general foreman of the forge department of the company. He testified:

"Q. What do you have jurisdiction over? What are your duties? Just state them generally as general foreman of the department. A. My duties are general supervision of all the work within my department.

"Q. Would you have anything to do with the operation and maintenance of the cranes in your department? A. That's under another department, but they put men in there to handle my work for me. * * *

"Q. Do you know what the condition of this crane was with reference to being in proper repair? A. I couldn't answer that, as I didn't go into the details of the repairs. I have heard it was in first-class condition. That would come under the electrical department."

Antes, who was the foreman of the electrical department of the company, testified:

"Q. You were foreman at the time Mr. Weisser was injured? A. Yes, sir.

"Q. What is your system down there with reference to the repair and maintenance of the cranes? A. The crane operator, coming on duty there morning or night, is to examine his crane thoroughly, and see that it is well oiled, and, in case everything is not as'it should be, he is to report it to the repairman before he moves it.

"Q. If there is a report of that kind, does the repairman go to work right away on it? A. Yes, sir. * * *

"Q. If that crane had been out of order, would you or would you not have known it? A. Yes, sir.

"Q. You would have known it because the craneman would have reported it? A. Yes, sir.

"Q. Your inspection of the cranes was done by the cranemen? A. Yes, sir; he usually inspected the cranes moved and reported to the repairmen.

"Q. The cranemen were the inspectors? A. Not altogether. We have inspectors that have nothing else to do but go around and inspect the cranes, and require them to thoroughly inspect all our cranes at least once a week.

"Q. If this crane had been out of order, and it had been slipping with a heavy load on, it was the duty of that craneman to ascertain that fact by an examination and report it to you? A. To the repairman.

"Q. He is supposed to report to the repairman who has somebody have it done? A. Yes, sir.

"Q. Wouldn't you be the man he would report to? A. If he couldn't get the repairman—called the chief repairman. All reports went to him.

"Q. You said you would have known it if it was out of order? A. I would.

"Q. It might have been out of order and you not know of it? A. The repairman kept reporting to me.

"Q. If the repairman wouldn't report it to you, you would not know it? A. No; I wouldn't.

"Q. You made no examination of it yourself? A. If it was a bad case, I did.

"Q. You don't know anything about this particular crane that Morrison was running that day? A. I didn't hear of it directly that day; no, sir."

Corcoran, who was chain inspector of the company, testified:

"Q. Were you acting in that capacity in February, 1907? No, sir; I had an assistant at that time and I was doing the office work in connection with helping him. He done all the inspecting himself.

"Q. Do you mean inspecting the chains that are attached to the cranes? ' A. The hook-on chains and the drum chains.

"Q. Did you personally know anything with regard to the condition of this crane in which Mr. Weisser was injured? A. No, sir; nothing more than our reports. I would like to state in that connection with my office work I took all the crane delays—

"Q. That is not in answer to my question. A. Well, as far as I know, nothing."

No crane inspector was produced by the company to testify as to the actual condition of the crane at and before the time of the accident. There was evidence strong enough to be submitted to the jury that the

crane was in an improper and defective condition at that time and that by reason of such condition a slipping occurred which permitted the second crane load to come in contact with the first in such manner as to cause the injuries complained of, and, further, that such defective condition of the crane had continued for such a length of time as to warrant the jury in charging the company with notice thereof and with responsibility for failure to repair it before the time of the accident. While it must be conceded that the case made by the plaintiff was not a strong one, we think, for the reasons above given, that there was no error in refusing a binding instruction for the defendant and in denying the motion for judgment non obstante veredicto.

The judgment below must be affirmed, with costs, and it is so ordered.